**REGAL ENTERTAINMENT GROUP, Plaintiff,**

v.

**AMARANTH LLC, individually and as representative of a class of all Note holders under the Indenture, Defendant.**

**C.A. No. 1226–N.**

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 6, 2006.
Decided: April 12, 2006.

William M. Lafferty, Susan W. Waesco, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Plaintiff.

Raymond J. DiCamillo, Michael R. Robinson, Elizabeth C. Tucker, Richards, Layton & Finger, P.A., Wilmington, DE, Robin A. Henry, Motty Shulman, Brian Kohn, Boies, Schiller & Flexner, L.L.P., Armonk, NY, for Defendant.

## OPINION

STRINE, Vice Chancellor.

This matter is before the court on the plaintiff's motion for the certification of a defendant class. The plaintiff in this case, Regal Entertainment Group, is the issuer of a series of convertible notes (the "Notes") under an "Indenture."

The issuer filed suit after one of the largest holders of Notes, defendant Amar-

anth LLC, publicly disputed Regal's method for calculating the number of shares of common stock that Noteholders would receive upon conversion. Facing uncertainty about an issue that affected all Noteholders, Regal filed this suit against Amaranth seeking a declaration that its interpretation was correct. Amaranth answered and asserted counterclaims, among which is a claim seeking a declaration that its interpretation, rather than Regal's, is correct.

The only objection that Amaranth raised to the motion for certification is that its status as a hedge fund should relieve it of the obligation to serve as the representative of a defendant class. Because Amaranth could sell the Notes in question, or engage in transactions in which it would take short- or long-positions regarding the Notes, Amaranth says it should not suffer the burden of serving as the class representative. As of November 2005, Amaranth was the beneficial owner, within the meaning of Rule 13d–3 of the Securities Exchange Act of 1934, of approximately $80,443,000 principal amount of the Notes at issue.[1]

In this opinion, I find that Amaranth's objections are makeweight. Amaranth is the Noteholder that publicly disputed Regal's interpretation of the Indenture. After this suit was filed, Amaranth asserted counterclaims against Regal.

Amaranth, therefore, is well-positioned to represent the class as it seeks to advance an interpretation contrary to Regal's and that affects all Noteholders. The fact that Amaranth might sell its Notes or at some later time engage in behavior that disqualifies it does not distinguish it from most class representatives in cases when class representative status is tied to the ownership of a class of securities. To date, Amaranth has not sold its Notes and has sought aggressively to contest the issuer's interpretation. Its self-interested desire to avoid the modest additional burden of serving as the representative of a defendant class is not sufficient to deny Regal's motion, particularly given that Regal clearly faces a circumstance when the certification of a defendant class is warranted to protect Regal against inconsistent claims by similarly situated Noteholders.

### I.

Regal Entertainment Group is the largest operator of movie theatres in the nation. In May 2003, Regal offered the Notes for sale to qualified institutional buyers under Securities and Exchange Rule 144A. Credit Suisse First Boston was the initial purchaser (i.e., the underwriter) of the offering. In that capacity, Credit Suisse bought the Notes in the first instance and then sold them to qualified institutional buyers.

The terms of the Notes were negotiated between Credit Suisse and Regal. Among the key terms were the provisions of the Indenture used to adjust the Conversion Price of the Notes when Regal paid dividends on its common stock—what I will call the Dividend Reduction Formula. These provisions were set forth in § 10.4(e) of the Indenture. Section 10.4(e) provides that the Conversion Price for the Notes in effect before the determination date of any dividend is to be multiplied by:

> a fraction of which (x) the numerator shall be the average of the Volume Weighted Average Prices for the three Trading Days ending on the date *immediately preceding the Ex–Dividend Date* for such dividend or distribution

---

1. Although not clear from Amaranth's papers, it appears that Amaranth also has short positions in Regal's common stock and, by contract, economic exposure to another $38 million face amount of the Notes but lacks voting or dispositive power over those Notes.

less the difference between ... and (y) the denominator shall be *such* average of the Volume Weighted Average Prices for the three Trading Days ending on the date *immediately preceding the dividend date* for such divided [sic] or distribution.[2]

According to Regal, both it and Credit Suisse intended that the numerator and the denominator in the Dividend Reduction Formula were to be the same. That is, Regal argues that the exclusion of the defined term "Ex–Dividend Date" in the denominator and the inclusion of the term "dividend date" in its place was not intended to create a distinction but was a scrivener's error in implementation.

That the numerator and denominator were to be the same, Regal argues, is made obvious by the purpose of the Dividend Reduction Formula, which simply was to reduce the Conversion Price by an amount equal to the fraction of the value of a share of Regal common stock that is paid out in a dividend in excess of the maximum allowed dividend under the terms of the Indenture.[3] To use an example, if the common stock share price used in the numerator and denominator was $1 per share and a five-cent excess dividend was declared and the conversion price was say $2, Regal says the formula would adjust the Conversion Price as follows:

$$(\$2 \text{ conversion price}) \times \frac{(\$1 \text{ per share} - \$0.05 \text{ excess dividend})}{\$1 \text{ per share}} = \$1.90$$

Thus, if the excess dividend is five percent of the value of a share of common stock, the conversion price will be reduced by five percent. In this way, the Formula for calculating adjustments to the Conversion Price works to preserve the value of the Notes' conversion feature by adjusting the Conversion Price exactly to account for the economic impact of periodic dividends that Regal might pay out in excess of the maximum allowed dividend.

Using the approach of treating the numerator and denominator in the Dividend Reduction Formula as if they were the same thing, Regal eventually made several adjustments to the Conversion Price after a series of dividend payments in 2004 and 2005. The quiet that accompanied those adjustments ended in March 2005.

That month, Amaranth began questioning the basis on which Regal was applying

the Dividend Reduction Formula. Specifically, Amaranth contended that the Indenture required the use of different dates to determine the weighted average trading price used in the numerator and denominator of the Formula. In a Schedule 13G filed that month, Amaranth claimed beneficial ownership of greater than 5% of Regal Common Stock by virtue of owning $80 million of the Notes. In the 13G, Amaranth contended that Regal had incorrectly calculated several adjustments to the Conversion Price after dividends paid on the Common Stock in 2004 and 2005. To wit, Amaranth advanced the proposition that the weighted average trading price in the numerator was measured by reference to the three trading days immediately before the Ex–Dividend Date—or the day after the last date on which someone who pur-

---

2. Emphasis added.

3. The Indenture originally considered a dividend to be excessive if it was greater than $0.60 per share, which was set based on the annual amount of Regal's periodic dividends paid at the time the Notes were issued. That maximum allowed dividend, $0.60, later was adjusted downward pursuant to § 10.4(i) of the Indenture.

chases Regal stock could expect to receive any forthcoming dividend—but that the weighted average trading price in the denominator was measured by reference to the three trading days immediately before the "dividend date," which Amaranth claimed must be different. Amaranth, however, did not indicate what it believed the dividend date to be; for example, whether that was the date on which the dividend was actually paid, the record date for the dividend, or the date on which a dividend was announced. Although the definition used by Amaranth was unclear, Amaranth claimed that the Conversion Price was $14.40719 as of March 2005 rather than the $15.6307 figure calculated by Regal.

On March 28, 2005, Amaranth provided notice that it wished to convert $1,000 face amount of its Notes using its Conversion Price. Regal honored that notice but used the $15.6307 Conversion Price it favored, which resulted in Amaranth receiving a lower number of shares of Common Stock than it sought.

In further response to Amaranth's actions, Regal acted to amend the Indenture, using its power under § 9.1(a) of that instrument, to cure ambiguities. Regal's proposed amendment changed the language of the Dividend Reduction Formula to calculate the average trading price in the numerator and denominator by reference to the three trading days immediately before the "Ex–Dividend Date." After providing the Trustee with the documentation required to accomplish an amendment of that kind, Regal and the Trustee effected the amendment in the form of a First Supplemental Indenture.

In concert with the approval of the First Supplemental Indenture, Regal filed this suit against Amaranth. Regal's complaint sought a declaratory judgment that: 1) its reading of the original language of § 10.4(e) was correct and that the Conversion Price after Regal's March 15, 2005 dividend was $15.6307; and 2) its approval of the First Supplemental Indenture was valid, proper and effective.

Amaranth answered the complaint and asserted three counterclaims. The counterclaims are directly contrary to the relief sought by Regal. Amaranth seeks: 1) a declaration that its reading of § 10.4(e) is correct and that the Conversion Price after the March 15, 2005 dividend was $14.40719; 2) an award of additional Regal common shares or monetary damages to compensate it for the shortfall resulting from Regal's use of the higher $15.6307 Conversion Price in responding to Amaranth's March 28, 2005 Conversion notice; and 3) a declaration that the First Supplemental Indenture is invalid because it materially alters the proper Dividend Reduction Formula intended by the original parties to the Indenture.

Amaranth has clarified its position on the Dividend Reduction Formula, making clear that it believes that the numerator in the Formula is measured by the volume weighted average price for the three trading days immediately before the Ex–Dividend Date, while the denominator is measured by the volume weighted average price for the three trading days immediately before the date on which the dividend is paid.

Amaranth characterizes Regal's contrary reading as "untenable" and its execution of the Fist Supplemental Indenture as "improper."

## II.

This case comes before me on a motion for class certification under Court of Chancery Rule 23. It is undisputed that most of the elements required for certification are satisfied and therefore I address only

the elements contested by Amaranth. Amaranth refuses to assent to serving as a defendant class representative on the grounds that a) it cannot adequately represent the defendant class, and b) it is not typical of the defendant class.

Amaranth premises that argument on its status as a hedge fund:

> By its very nature as a hedge fund, Amaranth employs investment strategies by which its interest may not be aligned with all of the approximately ninety members of the putative class. As is typical of hedge funds, Amaranth's traders regularly review the fund's portfolio and make decisions to hold, liquidate or increase its positions (and, in the case of options and convertible securities, including its position in the Regal convertible bonds, whether to exercise or convert those positions) based on a complex array of investment considerations. For this reason, hedge funds are often not considered appropriate class representatives. In this case, if Amaranth, for example, decides to liquidate its position in Regal's convertible bonds, it would no longer have any stake in this litigation and would not have any interest in vigorously representing the class. Thus, Amaranth is not an adequate class representative, and Regal's

motion seeking class certification should be denied.[4]

More particularly, Amaranth alleges that it has a fiduciary obligation to its investors to sell its large position in the Regal Notes if that is in the best interests of its investors. Furthermore, Amaranth argues that it takes complex investment positions, and that as to Regal, owns not only the Notes, but a short position in Regal's common stock and interests in swap agreements relating to the Notes. For that reason, Amaranth claims it lacks typicality.

Although I recognize that some courts have refused to appoint hedge funds as class representatives in very different contexts,[5] Amaranth's arguments here are insubstantial and do not come close to justifying denial of Regal's motion to certify a class.

■ As to the question of adequacy, Amaranth is extremely well-positioned to serve as an adequate class representative and easily satisfies the requirements of Rule 23(a)(4). Amaranth owns an extremely large position in the Notes. It is the Noteholder that chose to contest publicly the method by which Regal computes the Conversion Price, thus putting Regal in a position where it either had to assent to Amaranth's interpretation and make ad-

---

4. Amaranth Br. at 1.

5. A sampling of cases of this kind includes: *Hamilton Partners, Ltd. v. Sunbeam Corp.*, 2001 WL 34556527 (S.D.Fla. July 3, 2001) (refusing to grant class certification, not because the hedge fund was disqualified from acting as class representative, but because the diverse investment strategies of the class destroyed any class-wide presumption of reliance); *In re MicroStrategy Inc. Sec. Litig.*, 110 F.Supp.2d 427, 436–37 (E.D.Va.2000) (deciding not to select a hedge fund as lead plaintiff in a suit under the PSLRA because most of its losses "occurred before defendants issued the first correction" to the misleading disclosures when the average member of the class suffered its losses after the first correction); *In*

*re Bank One S'holders Class Actions*, 96 F.Supp.2d 780, 783–84 (N.D.Ill.2000) (declining to appoint hedge fund as lead plaintiff in part because of its trading strategies when there were ESOP plaintiffs available who were more adequate; however, the court did not hold that the hedge fund would not have been adequate, only that the other plaintiffs were the most adequate). Evidence that mere status as a hedge fund is not disqualifying is found in the decision of Judge Robinson of the United States District Court for the District of Delaware to certify four hedge funds as lead plaintiffs in the securities class action, *In re Tyson Foods Inc. Sec. Litig.*, 2003 WL 22316548 (D.Del.2003).

justed payments to all Noteholders or to bring a suit to obtain a declaration that its own interpretation, rather than Amaranth's, was correct. Amaranth answered Regal's suit and filed mirror-image counterclaims.

The reality that Amaranth might sell distinguishes it not a bit from any other type of investor serving as a class representative. Even if Amaranth sells its Notes, Amaranth has already stated a claim based on its past conversion of $1,000 worth of Notes. Therefore, it would not even lose standing upon a sale of its position, unless it abandoned its counterclaim. Likewise, the meaning of the Dividend Reduction Formula also will influence the price at which Amaranth can sell its Notes, as it relates to their value when converted into Regal common stock.[6] It is important that judges' minds remain open and supple; therefore, I concede that if Amaranth sells its Notes, drops its counterclaims, and disclaims any claims regarding the price at which it sold its Notes, then an issue might arise about the propriety of its continuation as class representative. But given that Amaranth's own adversarial posture toward Regal's interpretation of the Dividend Reduction Formula is what generated this lawsuit and given that Amaranth has the largest position in the Regal Notes, it comes with ill

grace for it to use the hypothetical possibility that it will sell its Notes in the future as a pretext to avoid serving as class representative. Individual investors, mutual funds, and pension funds all also sell their holdings when that is advisable, and mutual and pension funds have the same sort of fiduciary obligations to their investors that Amaranth points to as influencing their decisions whether to hold.

The ill grace of Amaranth's position is, of course, heightened by the obvious need for Regal to have an answer to the dispute which Amaranth surfaced regarding the Dividend Conversion Formula. It is essential for Regal that there be one reliable answer that binds all the Noteholders.[7] Amaranth is ideally situated to represent the Noteholders in arguing their side of the relevant question, as it has a large stake in the answer, has aggressively advocated a position contrary to that of Regal, and has retained experienced and well-regarded counsel to advance its position. Given Amaranth's obvious adequacy, its reluctance to burden itself with serving as a class representative is not a sufficient basis for rejecting Regal's motion for certification of a defendant class with Amaranth as class representative.[8] Nor are the trivial, if extant, additional costs and burdens Amaranth will take on as class representative a justification for denying Re-

---

**6.** TOM COPELAND ET. AL., MCKINSEY & COMPANY, INC., VALUATION: MEASURING AND MANAGING THE VALUE OF COMPANIES 424 (3d ed. 2000) (explaining that the conversion price is one of the categories of information needed to value a callable, convertible bond).

**7.** Ct. Ch. R. 23(b)(1), (2); *see also Zimmerman v. Home Shopping Network, Inc.,* 1989 WL 102488, at *7 (Del.Ch. Sep. 1, 1989) (addressing the propriety of a suit by debenture holders in Delaware regarding the conversion formula for those instruments and stating that the issuer could have brought a defendant class action to bring the debenture holders before a court, but made a tactical decision not to do so).

**8.** *See Leon N. Weiner & Assoc., Inc. v. Krapf,* 584 A.2d 1220, 1224 (Del.1991) (noting defendant can be appointed class representative despite its reluctance if the court is assured that the defendant is nonetheless committed to opposing the plaintiff's request for relief); *Prezant v. De Angelis,* 636 A.2d 915, 923–24 (Del.1994) (explaining that certification of defendant class is appropriate if the court is convinced that the proposed class representative will represent the absent members of the class adequately and if the relief sought by the particular plaintiffs who bring the suit can be thought to be what would be desired by the other members of the class); 7A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 1770 (3d ed. 2005) ("[T]he fact that the

gal's motion; after all, "it is unlikely that a defendant who represents a class on a common issue will incur significant additional expenses; the class representative can simply conduct the same defense he would have presented had he been sued as an individual." [9]

■ Likewise, Amaranth's plea that it fails the typicality requirement of Rule 23(a)(3) lacks legal and equitable appeal. Although it may be a psychic blow to some titans of trading to read this, the reality is that so-called hedge funds are not so special and their trading strategies are often more different in degree than in kind from that of other common investment funds.

In that regard, it is increasingly the case that all sorts of investment funds engage in hedging strategies, of diverse kinds. It is not critical that Amaranth might (and that is a big "might") suffer different damages than other class members. [10] Courts have rejected, in more complex cases than this one, the notion that the trading strategies of a proposed representative made them atypical. [11] The key question in the narrow case is one common to all Noteholders: how is the denominator in the Dividend Conversion Formula calculated? For typicality purposes, what is important is that Amaranth's position regarding the Dividend Conversion Formula be typical of

named representatives are reluctant does not necessitate the denial of class certification if the court finds that they have the incentive and ability to protect the entire class effectively.").

9. Note, *Defendant Class Actions*, 91 Harv. L.Rev. 630, 648 (1978). *See also Raider v. Sunderland*, 2006 WL 75310, at *1 (Del.Ch. Jan. 4, 2006) (noting that where class representatives do shoulder additional financial burdens as a representative both Delaware and federal law permit the class representative to be awarded additional compensation).

10. *E.g., Zeffiro v. First Pennsylvania Banking & Trust Co.*, 96 F.R.D. 567, 569–70 (E.D.Pa. 1983) (certifying class and explaining that assuming that plaintiff and each member of the represented group have an interest in prevailing on similar legal claims, particular factual differences, such as differences in the amount of damages claimed or even the availability of certain defenses against a class representative, may not render the representative's claims atypical); *Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981) (stating that the difference in the damages amount claimed by the class representative and other class members did not render the representative's claim atypical); *see* 7A Wright, Miller & Kane, Federal Practice and Procedure § 1764 (3d ed. 2005) ("[T]he [typicality] requirement may be satisfied even though varying fact patterns support claims or defenses of individual class members or there is a disparity in the damages claimed by

the representative parties and the other class members.").

11. *E.g., Saddle Rock Partners, Ltd. v. Hiatt*, 2000 WL 1182793, at *4 (S.D.N.Y. Aug.21, 2000) (stating that the named plaintiff's "sophistication does not detract from the fact that ... [the] claim of fraudulent conduct flows from the same course of events ... and gives rise to the same legal liabilities, as is true for the class members it seeks to represent."); *In re Oxford Health Plans, Inc. Sec. Litig.*, 199 F.R.D. 119, 123 (rejecting the argument that the two plaintiffs who sought to be lead plaintiffs were not suitable because they were market makers in the company's options and were therefore atypical); *Danis v. USN Commc'ns, Inc.*, 189 F.R.D. 391, 397 (N.D.Ill. 1999) (explaining that the fact that plaintiff may have used somewhat distinctive buying strategies does not render him atypical with respect to the claim of overarching fraud); *Gilbert v. First Alert, Inc.*, 904 F.Supp. 714, 720 (N.D.Ill.1995) ("Simply because the individual plaintiffs may be stock speculators does not place them in a different position from other members of the class with respect to the allegation that defendants disseminated false or misleading information."); *see* 7A Wright, Miller & Kane, Federal Practice and Procedure § 1768 (3d ed. 2005) ("[Because] a particularly sophisticated investor ... [is] more knowledgeable than the typical [investor] does not automatically disqualify [that] person from being a proper representative....").

and aligned with the interests of the other Noteholders. It obviously is, and if Amaranth succeeds in proving that its reading of the Formula is correct, that victory will redound to the benefit of the entire Noteholder class. Because of that, Amaranth meets the relatively non-stringent test for typicality.[12]

## III.

For all the foregoing reasons, Regal's motion for class certification is GRANT-ED. Regal shall submit a conforming order, with notice as to form, within ten days.

---

[12]. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith*, 259 F.3d 154, 183 (3d Cir.2001) (noting that the courts have set a "low threshold" for satisfying typicality and that claims based on common course of conduct satisfy typicality); *Weiner*, 584 A.2d at 1225 (articulating that typicality is satisfied even if a representative's legal and factual position is not identical to the rest of class, key is that a representative's claim or defense arises from the same event or course of conduct that gives rise to the claims or defenses of other class members and is based on the same legal theory); *Paine Webber R & D Partners, L.P. v. Centocor, Inc.*, 1997 WL 719096, at *4 (Del.Super.Oct.9, 1997) (explaining that when a representative's claims or defenses arise out of same circumstances affecting rest of the class and the representative's position is based on same legal theory as rest of class, typicality is satisfied); *In re Merrill Lynch Sec. Litig.*, 191 F.R.D. 391, 397 (D.N.J.1999) (noting if the acceptance of the representative's legal position would vindicate the entire class's interests, then the representative is typical), *aff'd*, 259 F.3d 154 (3d Cir.2001). *See generally* 7A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 1764 (3d ed. 2005) ("[T]ypical claims need not be identical to one another; something less restrictive is appropriate to satisfy Rule 23(a)(3).").